# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND, KRAUSS, and BORGERDING
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private (E2) MASON D. DIVINE**
**United States Army, Appellant**

ARMY 20120962

Headquarters, United States Army Signal Center of Excellence and Fort Gordon
Tiernan Dolan, Military Judge
Colonel John P. Carrell, Staff Judge Advocate

For Appellant: Colonel Patricia A. Ham, JA; Lieutenant Colonel Imogene M. Jamison, JA; Major Jacob D. Bashore, JA (on brief); Lieutenant Colonel Imogene M. Jamison, JA; Major Jacob D. Bashore, JA (on supplemental brief); Colonel Kevin Boyle, JA; Lieutenant Colonel Peter Kageliery, Jr, JA; Major Jacob D. Bashore, JA (on reply brief).

For Appellee: Lieutenant Colonel James L. Varley, JA; Major Elisabeth A. Claus, JA; Captain Sean P. Fitzgibbon, JA (on brief).

26 June 2014

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BORGERDING, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of aggravated sexual assault and wrongful sexual contact in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. §§ 920 (2006 & Supp. IV 2011) [hereinafter UCMJ].[1] The military judge sentenced appellant to a

---

[1] After findings, but prior to sentencing, the military judge dismissed an abusive sexual contact specification and an assault consummated by a battery specification and charge, violations of Article 120 and 128, UCMJ, 10 U.S.C. §§ 920, 928, as "multiplicious" with the remaining offenses.

dishonorable discharge and confinement for forty months. The convening authority approved the adjudged sentence.

This case is before the court for review under Article 66, UCMJ. Appellant argues first that his convictions for aggravated sexual assault and wrongful sexual contact are both multiplicious and an unreasonable multiplication of charges. For the reasons set forth below, we agree that the wrongful sexual contact specification must be set aside and dismissed. Appellant's supplemental assignment of error alleging ineffective assistance of counsel merits discussion, but no relief. Appellant also personally raises matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), which we find are without merit.

**FACTS**

Sergeant (SGT) ZH-M was diagnosed with breast cancer. As part of her treatment, she underwent chemotherapy and radiation treatments, a mastectomy, and two "tramflap" procedures, which required the removal of stomach muscles and tissue to reconstruct the breast area. Sergeant ZH-M described the pain after the tramflap procedures as "off the scale" and "excruciating." After the tramflap surgeries, she was required to wear a medical band around her stomach to keep the stomach in place. She described the band as a "white brace that was very thick and it went all the way around my belly and it had Velcro that kept it attached."

On 19 May 2011, SGT ZH-M was at home recuperating after having drains removed from the tramflap surgical site, which also caused "off the scale" pain. To manage her pain and her panic attacks and to allow her to sleep, she took Percocet, Ativan, Seroquel, Celexa, and Tamoxifen. She testified, and an expert "in pharmacy" confirmed, that individually these medications caused drowsiness, disorientation, slurred speech, some memory loss, and other side effects. When taken together, SGT ZH-M described the feeling as "like a bad high, like going in and out of consciousness almost, like out of my mind almost."

Because of SGT H-M's condition, on 19 May 2011, appellant was tasked to pick up her children from school. When they arrived at SGT ZH-M's house, appellant and the children entered the bedroom. SGT ZH-M was in her bed, wearing just a sports bra, the medical band, and underwear. She was lying flat on her back to alleviate the pain and could not use her stomach muscles in any way. The children spoke to SGT ZH-M for a few minutes, during which her 10-year old son described her as "kind of asleep and kind of not." Her son testified that she talked to them, but he could not understand her because "she was going in and out like she was asleep and part not sleep [sic]."

Appellant eventually told the children leave the room and then he shut and locked the door. Sergeant ZH-M remembered the children and appellant initially

coming in the room and the children leaving the room.  The next memory SGT ZH-M had was appellant getting off of her, standing by the television, telling her he was "cumming."  Appellant went to the bathroom and then left her room.  Sergeant ZH-M fell back asleep, but later that evening, she went to the bathroom and saw a bloody discharge after she wiped.  She testified that she felt "pressure" like she had been "penetrated."  She felt confused at the time, "like maybe something had happened."  She washed herself off, went back to bed, and again fell asleep.  The next morning, she texted appellant to find out what had happened, and he eventually admitted that he had had sexual intercourse with her, telling her that she said it was ok and he thought she would like it.  After this text conversation, SGT ZH-M reported the assault to her squad leader, Sergeant First Class (SFC) CT.

## UNREASONABLE MULTIPLICATION OF CHARGES

### *Procedural Background*

Appellant was charged with three specifications alleging that on or about 19 May 2011 appellant touched SGT ZH-M "with his penis" and one specification alleging that on or about 19 May 2011 he penetrated SGT ZH-M's genital opening "with his penis."  The facts in the record indicate there was only one instance in which appellant touched or penetrated SGT ZH-M with his penis on 19 May 2011.  Indeed, trial counsel asserted in his argument on findings that "[t]here are offenses charged in the alternative," to include the abusive sexual contact, wrongful sexual contact, and assault consummated by a battery specifications.  The military judge then asked the trial counsel if it was the government's position that appellant could not be found guilty of all three of the specifications alleged under Article 120, UCMJ.  Trial counsel responded that "[o]ur argument is that based on the misconduct it proves up aggravated sexual assault."  Trial counsel then asked the military judge to "find [appellant] guilty of all charges and specifications."

The military judge found appellant guilty of all charges and specifications, but he promptly announced that Specification 2 of Charge I (abusive sexual contact) was multiplicious with Specification 1 of Charge I (aggravated sexual assault), and that the Specification of Charge II  (assault consummated by a battery) was multiplicious with Specification 3 of Charge I (wrongful sexual contact).  He dismissed the specifications alleging abusive sexual contact and assault consummated by a battery.

However, the military judge also concluded that the specification alleging wrongful sexual contact was not multiplicious with the aggravated sexual assault specification and, citing *United States v. Campbell*, 71 M.J. 19 (C.A.A.F. 2012), held that these two specifications would "co-exist" for sentencing purposes.  Finally, the military judge noted that he did a "*Quiroz* analysis" and found that the "government did not act unreasonabl[y]" in alleging both aggravated sexual assault

3

and wrongful sexual contact. *See United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001). This was the extent of his ruling and defense counsel did not object or otherwise request further relief.

### Law and Analysis

The government on appeal, quoting *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010), concedes that "the wrongful sexual contact was 'necessarily included in the offense charged [aggravated sexual assault].'" However, we will not address the specific issue of "multiplicity," that is, "that which is aimed at the protection against double jeopardy;" rather, we decide this case on the concept of "unreasonable multiplication of charges." *See Campbell*, 71 M.J. at 23.

"What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." Rule for Courts-Martial 307(c)(4). "[T]he prohibition against unreasonable multiplication of charges addresses those features of military law that increase the potential for overreaching in the exercise of prosecutorial discretion." *Campbell*, 71 M.J. at 23 (quoting *Quiroz*, 55 M.J. at 337) (internal quotation marks omitted). In *Quiroz*, our superior court listed five factors to help guide our analysis of whether charges have been unreasonably multiplied:

> (1) Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?[2]
>
> (2) Is each charge and specification aimed at distinctly separate criminal acts?
>
> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?

---

[2] This court may grant relief under our Article 66(c), UCMJ, powers to affirm "only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find[] correct in law and fact and determine[], on the basis of the entire record, should be approved." *Quiroz*, 55 M.J. at 338 (quoting UCMJ art. 66(c)). This "awesome, plenary, *de novo* power" provides us with the authority to consider all claims of unreasonable multiplication of charges, even if raised for the first time on appeal. *Id.* (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)); *see also United States v. Anderson*, 68 M.J. 378, 386 (C.A.A.F. 2010) ("[A]pplication of the *Quiroz* factors involves a reasonableness determination, much like sentence appropriateness, and is a matter well within the discretion of the CCA in the exercise of its Article 66(c), UCMJ, powers.") (internal citation omitted).

(4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?

(5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

55 M.J. at 338-39.

After balancing the *Quiroz* factors in this case, we conclude that appellant's convictions for both wrongful sexual contact and aggravated sexual assault constitute an unreasonable multiplication of charges. We agree with the military judge's conclusion that there is no evidence of prosecutorial overreaching or abuse in the drafting of charges because "the government is always free to plead in the alternative." *Jones*, 68 M.J. at 472-73. However, convictions for both aggravated sexual assault and wrongful sexual contact exaggerate appellant's criminality because the facts supporting each conviction were not aimed at distinct, separate, criminal acts, but rather, were part of the single transaction of appellant's sexual assault on SGT ZH-M. We will set aside and dismiss the wrongful sexual contact specification in our decretal paragraph.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### *Procedural Background and Additional Facts*

In a supplemental assignment of error, appellant alleges that his trial defense counsel, Captain (CPT) EG, was deficient because he failed to interview SFC CT, who was SGT ZH-M's squad leader at the time of the offense and had previously been appellant's squad leader.

Because of SGT ZH-M's condition, SFC CT had been helping her on occasions previous to 19 May 2011 by picking up her children from school. However, SGT ZH-M testified that as a result of SFC CT's own "duties at the company," SFC CT was unable to continue helping her, assigned appellant to pick up her children from school, and told SGT ZH-M that appellant "was the only one at the company who could help [her]." Sergeant ZH-M also testified that she and appellant were not friends or otherwise in a relationship.

In a statement under penalty of perjury provided to this court, SFC CT asserts that he could have testified to the following: 1) the circumstances surrounding SGT ZH-M's initial report of sexual assault, 2) that appellant and SFC ZH-M had a "relationship" with each other and that "[i]t was hard getting them to stay away from each other even though [SFC CT] told them it was not good for them to be together," 3) that appellant was not assigned by the unit to help SGT ZH-M; that SFC CT did not tell SGT ZH-M that appellant was the only soldier available to help her; that

5

they "let" him help her because he wanted to help; that SFC CT or another cadre member "was always available to help pick up the kids," and 4) that in his opinion, SGT ZH-M was not a truthful person. In an affidavit submitted to this court, CPT EG asserts that he does not remember whether or not he interviewed SFC CT, but he recalls that "SGT ZH-M made the report within 24 hours of the alleged assault" to SFC CT and that in reviewing the Criminal Investigation Command's (CID) report of investigation, he found it "did not provide a basis for believing that SFC [CT] had information favorable to [his] client's defense."

### *Law and Analysis*

The Sixth Amendment guarantees an accused the right to the effective assistance of counsel. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)). To establish that his counsel was ineffective, "appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The prejudice prong of the test for ineffective assistance of counsel requires a showing that the "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

When reviewing an ineffectiveness claim, "'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant.' Rather, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (quoting *Strickland*, 466 U.S. at 697).

Assuming without deciding that CPT EG's performance was deficient, we hold appellant has made an insufficient showing of prejudice. If SFC CT had testified in accordance with his affidavit, the sum purpose of his testimony would have been to impeach SGT ZH-M's credibility. We conclude there is no "reasonable probability" that SFC CT's testimony—even had it achieved the desired effect of undermining SGT ZH-M's credibility—would have produced a different result in the proceeding. *See Strickland*, 466 U.S. at 694.

First, according to his affidavit, SFC CT could have informed the military judge that SGT ZH-M initially reported that she thought appellant "might have"

6

taken advantage of her when she was on her medication.  We find that this testimony would *corroborate*, not undermine, SGT ZH-M's testimony that she was substantially incapacitated and did not know what had happened to her.  Moreover, appellant admitted in his texts (and his testimony at trial) that he and SGT ZH-M had engaged in sexual intercourse on 19 May 2011.

Next, we recognize that SFC CT's testimony alleging (1) a "relationship" between SGT ZH-M and appellant, and (2) that appellant was not assigned by the unit to help SGT ZH-M; that SFC CT never told SGT ZH-M that appellant was the only soldier in the company who could help her; and that there were other cadre members, including himself, who would have been able to help her, would both directly contradict SGT ZH-M's testimony and lend credence to the defense position that SGT ZH-M consented to sexual activity.  However, both of these assertions would also directly contradict appellant's testimony because appellant testified that SGT ZH-M never gave him any reason to think she wanted to be more than friends or acquaintances; that he and SGT ZH-M did not have any interactions beyond brief greetings at the company or when he dropped off her kids at home; and that he was "assigned" and "on the list" to help her out because of her medical problems.  Moreover, defense counsel effectively cross-examined SGT ZH-M regarding her testimony that appellant was "the only one" who could help her.  During cross-examination, SGT ZH-M admitted that the day before the incident, SFC CT had picked up her children at school, which was further supported by a text message appellant sent to SGT ZH-M the same day telling her SFC CT had already picked up her children from school.

Finally, SFC CT also asserts that he could have given a mixed opinion of her character for untruthfulness, stating that: "[a]s it dealt with military matters, she appeared to me to be truthful.  However, as to personal matters, she would lie through her teeth to protect her own reputation and personal interests, and she would be untruthful to manipulate you to get what she wanted."  Even if SFC CT's testimony successfully diminished SGT ZH-M's credibility, the result of the proceeding would not have been different because appellant's credibility after testifying was non-existent.  *See generally United States v. Pleasant*, 71 M.J. 709, 712 (Army Ct. Crim. App. 2012) ("When an accused testifies on his own behalf, he does so at his own peril, risking that he might fill in gaps or provide affirmative evidence contributing to or resulting in his conviction.").

> [A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt.  By substantive we mean evidence adduced for the purpose of proving a fact in issue as opposed to evidence given for the purpose of discrediting a witness (i.e., showing that he is unworthy of belief), or of corroborating his testimony. . . . [W]hen a defendant

> chooses to testify, he runs the risk that if disbelieved the
> jury might conclude the opposite of his testimony is true.

*Id.* at 713 (quoting *United States v. Williams*, 390 F.3d. 1319, 1325 (11th Cir. 2004) (internal citations and quotation marks omitted).

Appellant described for the military judge an incredible scenario in which SGT ZH-M not only engaged in consensual sexual intercourse with him, but one in which she initiated the encounter by calling appellant up to her room, asking him to lock the door once the children left, kissing him, and then taking her underwear off "down to her ankles."[3]  Appellant made this assertion in spite of the fact that he described their previous interactions as merely exchanging greetings in the company area from time to time and his admission that SGT ZH-M had not given him any reason to think she wanted to be more than friends or acquaintances with him.

In addition, despite the fact that SGT ZH-M described her medical band as "thick" and going all the way around her belly, appellant claimed that he did not know she was wearing the brace, describing it instead as a "tank top."  Appellant testified that during the encounter, "[b]oth of our hands were on each other's body" yet maintained he could not feel the brace because he "wasn't like on top of her like body to body… there was a little space there" and he was not "touching her with my stomach to her stomach."  Nevertheless, appellant also claimed this activity was "sensual."

Finally, appellant asserted that he did not know SGT ZH-M did not feel well when he was in her room, but he sent her a text message the next day saying: "U were just yelling my name and looking so hot even when u didn't feel good" and claimed that he deleted the only text message on his phone that would exonerate him, while leaving all of the inculpatory texts on there for investigators to recover.

In contrast, SGT ZH-M testified that when appellant had sex with her, she was in her bed at home recovering from major surgery and was on multiple, powerful medications that caused her to go in and out of consciousness.  SGT ZH-M described herself as "laying in a sports bra which underneath that my breast are [sic] mutilated.  I'm a cancer patient laying there in a brace -- a stomach brace which underneath that my stomach is all cut up." Prosecution Exhibit 1 consists of numerous text messages between appellant and SGT ZH-M the morning after the assault that corroborates SGT ZH-M's testimony as to her substantial incapacitation. In these texts, SGT ZH-M says things like, "I feel like you took advantage of me

---

[3] Appellant's contention that the kids left on their own, after which he shut the door, is directly contradicted by the testimony of SGT ZH-M's ten-year-old son, who testified that it was appellant who asked the children to leave the room.

while i was under the influence of meds…" and "[w]hat im [sic] trying to understand is if and y [sic] you had sex with me."  Furthermore, an expert corroborated the fact that the combination of medications SGT ZH-M was taking would cause somebody to be "very sedated."

The main defense strategy was to raise reasonable doubt as to SGT ZH-M's substantial incapacitation by highlighting the fact that she did remember some things—such as her children and appellant being present in the room and later leaving—and the fact that there was no evidence of how much or how many of the medications she took and whether that amount would cause her to be substantially incapacitated.  Even if SFC CT's testimony would have called SGT ZH-M's credibility into question, under the facts of this case, specifically SGT ZH-M's physical and mental state at the time of the assault, the corroborating text messages exchanged between SGT ZH-M and appellant the next morning, the corroborating testimony of SGT ZH-M's son and the expert "in pharmacy," and appellant's absurd testimony, there is still no "reasonable probability" that appellant would have been acquitted of aggravated sexual assault.  *See Strickland*, 466 U.S. at 694.  The absence of SFC CT's testimony does not "undermine confidence in the outcome" of this trial, and we accordingly find appellant has not carried his burden to demonstrate prejudice.  *See id*.

**CONCLUSION**

The finding of guilty of Specification 3 of Charge I is set aside and that specification is dismissed.  The remaining findings of guilty are AFFIRMED.

Reassessing the sentence on the basis of the error noted, the entire record, and applying the principles of *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986) and the factors set forth in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), we are confident the military judge would have adjudged the same sentence.

There is no dramatic change in the penalty landscape or exposure.  *See Winckelmann*, 73 M.J. at 15-16.  As a result of our decision, appellant's maximum sentence to confinement is reduced only from thirty-one years to thirty years. *Manual for Courts-Martial, United States* (2008 ed.), pt. IV, ¶ 45.f(2), (7).  Despite facing a maximum sentence to confinement of thirty-one years, the military judge sentenced appellant to only, *inter alia,* forty months confinement.  The nature of the remaining offense fully captures the gravamen of appellant's criminal conduct.  *See Winckelmann*, 73 M.J. at 16.  Appellant was tried by a judge alone.  *See id.*  Finally, this court reviews the records of a substantial number of courts-martial involving sexual assaults and we have extensive experience with the level of sentences imposed for such offenses under various circumstances.  *See id.*

DIVINE — ARMY 20120962

The sentence is AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by this decision, are ordered restored.

Senior Judge LIND and Judge KRAUSS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court